UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ALMA CHAVEZ, individually, and as Special Administratrix of the Estate of RAFAEL ALONSO OLIVAS,<br><br>           Plaintiff,<br><br>v.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT; CHRISTOPHER GRIVAS, individually and in his official capacity; DAVID HAGER, individually and in his official capacity; SHERIFF DOUGLAS C. GILLESPIE, individually and in his official capacity; DOE OFFICERS I-X; DOES XI-XX, inclusive,<br><br>           Defendants. | 2:11-CV-01445-LRH-GWF<br><br>ORDER |

Before the Court is Defendant Las Vegas Metropolitan Police Department's ("LVMPD") Motion for Summary Judgment. Doc. #72.[1] Also before the Court is Defendants Christopher Grivas ("Grivas") and David Hager's ("Hager") Motion for Summary Judgment. Doc. #73. Plaintiff Alma Chavez ("Chavez") filed an Omnibus Opposition to both Motions (Doc. #76), to which the LVMPD, Grivas, and Hager (collectively "Defendants") replied (Doc. #80).

///

---

[1] Refers to the Court's docket number.

## I. Factual Background

This is a civil rights and wrongful death action arising out of the shooting death of Chavez's son, Rafael Alonso Olivas ("Olivas"), by Officers Grivas and Hagar of the LVMPD. On July 14, 2011, at 6:46 a.m., Chavez called 911 to request assistance from the LVMPD for Olivas, who had been arguing with a female friend. Doc. #72, Ex. D., pp. 174-77; Doc. #72, Ex. L, p. LVMPD001609. Chavez told the 911 dispatcher that Olivas was "out of control," that he was "not in his mind right now," and she requested that "somebody specialized" be sent to the residence. Doc. #72, Ex. L, p. LVMPD001609-1610. Chavez also informed the 911 dispatcher that Olivas had been drinking and that, although he had not been diagnosed with any mental disabilities, he suffered from "anger." Doc. #72, Ex. L, p. LVMPD001612-1613.

Olivas became further upset upon learning that Chavez had called the police. *See* Doc. #72, Ex. L, p. LVMPD001610 (transcript of the 911 recording in which Olivas is overheard yelling "Don't call the cops. Don't call the police to watch them fucking shoot me to fucking hell. I don't give a fuck ___ (inaudible)."); *See* Doc. #72, Ex. L, p. LVMPD001611 (transcript of the 911 recording in which Olivas is overheard yelling "Let them know that I'm gonna fucking kill those mother fuckers!" . . . "I don't give a fuck. Call the fucking police. I don't give a shit." . . . "Let them know right now I don't give a fuck. I don't give a fuck. I don't care. Call the fucking police. I'm gonna kill those other fuckers. ___ (inaudible) as soon as they fucking get here."). Thereafter, Olivas grabbed a kitchen knife and continued to make threatening remarks directed toward the police.[2] *See* Doc. #72, Ex. L, p. LVMPD001611 (transcript of the 911 recording in which Olivas is overheard yelling "I have a fucking knife in my fucking hand, and I'm gonna fucking stab the shit out of those mother fuckers." . . . "I don't give a fuck." . . . "Take that mother fucker. I don't give a

---

[2] At first Chavez informed the 911 dispatcher that Olivas did not have a knife and that he did not have access to a weapon. Doc. #72, Ex. L, p. LVMPD001612. Thereafter, Chavez informed the 911 dispatcher that Olivas "got a kitchen knife." Doc. #72, Ex. L, p. LVMPD001616.

2

fuck. Call ___ (inaudible). I don't give a shit."); *see also* Doc. #72, Ex. L, p. LVMPD001614 (transcript of the 911 recording in which Olivas is overheard yelling "As soon as they get here, I am gonna beat the shit out of those mother fucking ___ (both talking)."). Both Olivas and Chavez also made remarks indicating that Olivas wished to commit suicide by cop. *See* Doc. #72, Ex. L, p. LVMPD001615 (transcript of the 911 recording in which Olivas is overheard yelling "I'm out of your life already as soon as the fucking police are here, I'm out of your life. Trust me. I promise you you're out of my fucking life."); *see also* Doc. #72, Ex. L, p. LVMPD001617 (transcript of the 911 recording in which Chavez states that "He got a knife, and ___ (inaudible) he says that he's going to make the police kill him."). Olivas then left the residence with the kitchen knife and proceeded to walk back and forth on the street, apparently waiting for the LVMPD's arrival. *See* Doc. #72, Ex. L, p. LVMPD001617-1619.

This information was relayed to the officers[3] prior to their arrival on scene. *See* Doc. #72, Ex. T, p. 000001 ("PR says son is out of control," "[heard] arguing while LL," "son screaming and cussing while LL, saying he will kill the police," "son LMA/23 YO, was [drinking] last night," "mom thinks son has anger issues, not diagnosed w/ anything," "son now armed w/ kitchen knife," "lots of arguing & yelling on line," "says he is going to make the police kill him," "male walked out of res, [wearing] [black t-shirt], [black] shorts," "son is now walking back and forth on firestone w/ [knife] in hand"); *see also* Doc. #72, Ex. Q, 37:21-39:12. Officers Grivas and Hager were dispatched to respond at 6:54:28 a.m. Doc. #72, Ex. R, p. LVMPD00008; Doc. #72, Ex. P, 48:10-12; Doc. #72, Ex. Q, 37:9-20. Additionally, dispatch requested a Crisis Intervention Team

///

///

---

[3] Although Officer Joshua Houchen ("Houchen") is not a Defendant in this action, he was one of the officers responding to Chavez's 911 call. Officers Grivas, Hager, and Houchen will be collectively referred to as "the officers."

3

("CIT") Officer.[4]  *See* Doc. #72, Ex. S, 53:20.  In response thereto, Officer Houchen[5] assigned himself to the call at 6:54:40 a.m.  Doc. #72, Ex. R, p. LVMPD00008; Doc. #72, Ex. S, 53:10-24.

Before the officers arrived on scene, Olivas was observed standing at the corner of Firestone Drive and LaRue Court for over three minutes with the knife in his hand.  Doc. #72, Ex. W.[6]  Thereafter, he began walking northbound down the center of Firestone Drive toward the officers' cars.  Doc. #72, Ex. W.  When the officers pulled onto Firestone Drive, they observed Olivas walking toward their patrol cars with a knife in his hand.  Doc. #72, Ex. P, 87:15-88:14; Doc. #72, Ex. Q, 52:22-24; Doc. #72, Ex. S, 59:16-20.  Olivas was observed "swinging the knife like a machete" at "shoulder height" (Doc. #72, Ex. P, 89:5-90:5), with the knife "over his head" (Doc. #72, Ex. Q, 52:20-24), and "slashing [the knife] in an X motion from up right to down left and then up left to down right" (Doc. #72, Ex. S, 99:2-11).  The officers radioed to dispatch that Olivas was walking towards them with a knife in his hand at 6:58:06 a.m.  Doc. #73, Ex. T, p. LVMPD00001.

The officers stopped their patrol cars approximately 75-100 yards away from Olivas and took up tactical positions in close proximity to one another.  Doc. #72, Ex. P, 57:20-60:24; Doc. #72, Ex. Q, 53:5-55:10; Doc. #72, Ex. S, 69:6-71:12.  Officer Houchen announced that he had and intended to deploy low lethal force, but did not give any further instruction to Officers Grivas and Hager.  Doc. #72, Ex. P, 77:21-78:12; Doc. #72, Ex. Q, 57:8-11.  Officers Grivas and Hager provided Officer Houchen with lethal cover.  Doc. #72, Ex. P, 117:16-118:5; Doc. #72, Ex. Q, 57:12-17.  By the time the officers had exited the vehicles and taken up their positions, Officer

---

[4] In general, CIT officers respond to situations in which a subject displays some type of emotional and/or psychological condition (e.g., mental illness, mental disorder, intoxication, combative/non-compliant behavior).  *See* Doc. #72, Ex. S, 32:1-33:15; *see also* Doc. #76, Ex. 6 (LVMPD's CIT Policy Procedure and Resource Guide).

[5] Officer Houchen is a certified CIT Officer.  Doc. #72, Ex. S, 31:8-19.

[6] Chavez does not dispute the series of events that took place leading up to Officers Grivas and Hager's use of deadly force.

4

Houchen estimated that Olivas had closed the distance between himself and the officers to roughly 38 yards. Doc. #72, Ex. S, 72:6-18.

Immediately upon exiting their vehicles, all three officers began issuing commands to Olivas to drop the knife. Doc. #72, Ex. P, 61:6-62:2; Doc. #72, Ex. Q, 59:2-60:1; Doc. #72, Ex. S, 93:1-8. However, upon reaching their stationary positions, Officers Grivas and Hager ceased issuing commands and only Officer Houchen continued to give Olivas commands to drop the knife. Doc. #72, Ex. P. 86:6-87:1; Doc. #72, Ex. Q, 59:2-60:1; Doc. #72, Ex. S, 93:15-23, 95:1-22. A resident in the neighborhood heard the officers issuing commands to Olivas to get down and drop the knife before any shots were fired. Doc. #72, Ex. BB, 19:1-20:10. Chavez testified that she did not hear the officers make any commands to Olivas because she was too far away. Doc. #72, Ex. D, 232:23-233:4. Olivas did not respond to the officers' commands. Instead, he continued to advance at a fast pace while swinging the knife and yelling obscenities at the officers.[7] Doc. #71, Ex. P, 94:7-14; Doc. #72, Ex. Q, 61:5-23, 63:4-25; Doc. #72, Ex. S, 95:10-22.

Thereafter, Officer Houchen deployed four rounds of low-lethal bean bag shots. Doc. #72, Ex. S, 97:8-9; Doc. #72, Ex. P, 103:14-20; Doc. #72, Ex. Q, 65:22-25. From the time Officer Houchen alone began giving commands to the time he fired the first bean bag shot, Officer Hager estimated that 15 seconds had elapsed. Doc. #72, Ex. Q, 63:9-18. Officer Houchen testified that prior to the deployment of the low-lethal shots, he did not issue any warnings to Olivas as to his intent to discharge a firearm. Doc. #72, Ex. S, 96:6-10. At the time of the first deployment of the bean bag shots, Officer Houchen estimated that the distance between Olivas and the officers was 10-15 yards.[8] Doc. #72, Ex. S, 97:22-98:4. Officer Grivas testified that he saw all four bean bag shots hit Olivas. Doc. #72, Ex. P, 104:1-8. Officer Houchen only saw Olivas get hit with the first

---

[7] Officer Houcher testified that he could hear Olivas continuously yelling, but could not make out exactly what he was saying. Doc. #72, Ex. S, 95:10-22.

[8] Officer Houcher was later informed that the distance was approximately 11 yards. Doc. #72, Ex. S, 98:1-4.

1  bean bag shot. Doc. #72, Ex. S, 97:12-21. Officer Hager saw the first two bean bag shots hit
2  Olivas. Doc. #72, Ex. Q, 66:17-22. After the last bean bag shot, Officer Houchen's shotgun
3  malfunctioned. Doc. #72, Ex. S, 103:7-15. While he was attempting to remedy the malfunction,
4  Officer Houchen looked up and saw Olivas turn back toward the officers and take another step.
5  Doc. #72, Ex. S, 103:9-15. Officer Grivas testified that he saw Olivas take at least three steps
6  toward the officers after the last bean bag impact. Doc. #72, Ex. P, 109:16-110:16. Officer Hager
7  did not witness Olivas make any kind of movement toward the officers, however he saw the knife
8  up towards Olivas' head and he believed that Olivas was going to charge Officer Houchen. Doc.
9  #72, Ex. Q, 72:4-74:12.

10      At that point, Officer Grivas made the decision to use deadly force. Doc. #72, Ex. P,
11  110:17-18. Prior to utilizing deadly force, Officer Grivas communicated that he was "going
12  lethal."[9] Doc. #72, Ex. P, 111:22-112:25; Doc. #72, Ex. S, 96:11-16, 103:16-22. The officers have
13  varying accounts of the precise distance at which Olivas was standing from them when lethal force
14  was used.[10] Doc. #72, Ex. P, 139:11-14 (Officer Grivas testifying that he estimated the distance at
15  the time to be 20-30 feet); Doc. #72, Ex. Q, 76:16-18 (Officer Hager testifying that Olivas was
16  approximately 25 feet from him when he discharged his weapon); Doc. #72, Ex. S, 110:14-18
17  (Officer Houchen testifying that Olivas was an estimated 32 feet from Officers Grivas and Hager).
18  Both Officers Grivas and Hager testified that they believed they were in imminent danger at the
19  time they used lethal force. Doc. #72, Ex. P, 139:1-21 (Officer Grivas testifying that "[Olivas]
20  tried to stab [him]"); Doc. #72, Ex. Q, 71:11-18 (Officer Hager testifying that "[Olivas] turned and
21  made a motion with—he had the knife up towards his head and made a turn towards Officer
22  Houchen and it appeared that he was going to charge with the knife").

---

[9] It is unclear whether Olivas heard Officer Grivas state that he was "going lethal." Officer Houchen testified that he does not recall any warnings given directly to Olivas that deadly force would be used. Doc. #72, Ex. S, 100:23-101:3.

[10] At the location Olivas went down, Olivas was 27.14 feet from Officer Hager, 37.25 feet from Officer Houchen, and 36.71 feet from Officer Grivas. Doc. #72, Ex. Y.

1    Officer Grivas fired three shots at Olivas and Officer Hager fired four shots at Olivas.  Doc.
2 #72, Ex. DD, p. LVMPD001512.  Impacted by the shots, Olivas fell to the ground.  Doc. #72, Ex.
3 P, 132:1-25; Doc. #72, Ex. Q, 80:23-81:1; Doc. #72, Ex. S, 116:12-23.  At 6:59:31 a.m., the
4 officers advised that shots had been fired and requested that medical be expedited.  Doc. #72, Ex.
5 T, p. LVMPD00002.  Although Officer Hager did not perceive Olivas as a threat, he kicked the
6 knife away and proceeded to handcuff Olivas' hands behind his back.  Doc. #72, Ex. Q, 81:13-15,
7 82:1-2, 84:2-5.  Officer Grivas approached to render first aid, but believed that Olivas' injuries
8 were too severe.  Doc. #72, Ex. P, 137:14-19.  After hearing the gunshots, Chavez attempted to
9 reach Olivas, but she was intercepted by Officer Houchen who told her that she could not approach
10 in order to preserve the scene.  Doc. #72, Ex. S, 120:10-15.  Las Vegas Fire Rescue arrived on
11 scene at 7:07:16 a.m. and took Olivas to UMC Trauma at 7:08:19 a.m.  Doc. #72, Ex. EE.  Olivas
12 was pronounced dead at UMC Trauma at 7:40 a.m.  Doc. #72, Ex. FF.

13    On September 8, 2011, Chavez, on behalf of herself and Olivas' estate, filed this action
14 under 42 U.S.C. § 1983 and state law against the LVMPD, Officers Grivas and Hager, and Sheriff
15 Douglas Gillespie ("Gillespie") in their individual and official capacities.  Doc. #1.  The Complaint
16 contains six causes of action: (1) excessive force in violation of Olivas' rights under the Fourth,
17 Fifth and Fourteenth Amendments; (2) deprivation of Chavez's individual right to familial relations
18 under the First, Fourth and Fourteenth Amendments; (3) municipal liability under § 1983; (4)
19 wrongful death; (5) negligence; and (6) negligent supervision and training.  Doc. #1.  On May 30,
20 2012, the Court dismissed Sheriff Gillespie as a Defendant, and further dismissed all of Chavez's
21 official capacity claims against Officers Grivas and Hager.  Doc. #36.  Finally, the Court permitted
22 Chavez's first cause of action to proceed only as a Fourth Amendment excessive force claim by her
23 in a representative capacity.  Doc. #36.  Thereafter, Defendants filed the present Motions for
24 Summary Judgment on Chavez's remaining claims.  Doc. #72; Doc. #73.
25 ///
26 ///

7

## II.     Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

///

## III. Discussion

### A. Excessive Force

In their Motion for Summary Judgment, Officers Grivas and Hager argue that they are entitled to qualified immunity on Chavez's first cause of action for excessive force. *See* Doc. #73, pp. 4-12. In determining whether an officer is entitled to qualified immunity, courts employ a two-step test: first, the court determines "whether the officer violated a plaintiff's constitutional right"; where the answer to the first inquiry is "yes," the court "proceed[s] to determine whether the constitutional right was 'clearly established in light of the specific context of the case at the time of the events in question." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), *cert. denied*, 558 U.S. 1110 (2010)). The Supreme Court, however, has instructed that district courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

#### 1. Step One—Constitutional Violation

Excessive force claims are analyzed under the "objective reasonableness" standard of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Tennessee v. Garner*, 471 U.S. 1, 2 (1985); *see also Robinson v. Solano Cnty.*, 278 F.3d 1007, 1013-14 (9th Cir. 2002). The inquiry is a fact-intensive balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). Courts evaluate "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Robinson*, 278 F.3d at 1014 (citing *Graham*, 490 U.S. at 396). The Ninth Circuit considers whether the suspect poses an immediate threat to the safety of the officers or others to be the "most important" *Graham* factor. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). The Ninth Circuit also considers

the total "quantum of force" involved, the availability of alternative methods of detaining the suspect, and the arrestee's mental and emotional state. *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010). Courts conduct their evaluation of reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). Nevertheless, "[t]hese factors . . . are not exclusive. Rather, [courts] examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case[.]" *Mattos*, 661 F.3d at 441 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)) (internal quotation marks omitted). Because the assessment of objective reasonableness in excessive force cases is highly fact-specific, summary judgment should be granted sparingly. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 778-79 (9th Cir. 2004); *see also LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000).

Here, the Court declines to reach the issue of whether Officers Grivas and Hager violated Olivas' Fourth Amendment rights. First, the Court finds that Officers Grivas and Hager are entitled to the defense of qualified immunity because the law is not clearly established such that an officer would have understood his or her conduct to be unlawful under the circumstances. *See infra*. Accordingly, the Court need not reach the constitutional question as to excessive force. *See Glenn v. Washington Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011) (explaining that "[e]ither [prong of the qualified immunity] question may be addressed first, and if the answer to either is 'no,' then the officers cannot be held liable for damages") (citing *Pearson*, 555 U.S. at 236). Second, because the constitutional inquiry in this case is so fact dependant, the Court finds that its resolution will provide little guidance for future cases. *See Pearson*, 555 U.S. at 237 (acknowledging that "there are cases in which the constitutional question is so factbound that the decision provides little guidance for future cases"); *see also Scott v. Harris*, 550 U.S. 372, 388 (2007) (BREYER, J., concurring) (counseling against the *Saucier* two-step protocol where the question is "so fact dependent that the result will be confusion rather than clarity"); *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006) (observing that "the law elaboration purpose will [not] be well served . . .

where the Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts"). Accordingly, the Court proceeds to the second prong of the qualified immunity inquiry.

### 2. Step Two—Clearly Established Law

Even if the Court were to determine that Olivas' Fourth Amendment rights were violated, Officers Grivas and Hager would be entitled to the defense of qualified immunity for their use of deadly force. Indeed, "an officer using deadly force is entitled to qualified immunity, unless the law was clearly established that the use of force violated the Fourth Amendment." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)); *see also Saucier*, 533 U.S. at 200, *overruled on other grounds by Pearson*, 555 U.S. 223. In excessive force cases, the inquiry is whether "under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and whether any mistake to the contrary would have been unreasonable." *Boyd*, 374 F.3d at 781; *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003). The qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation marks omitted); *see also Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (noting that qualified immunity covers "mere mistakes in judgment") (Kennedy, J., dissenting); *see also Saucier*, 533 U.S., at 206 (qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force'"). Moreover, courts must "allow 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mattos*, 661 F.3d at 442 (quoting *Graham*, 490 U.S. at 396-97). Finally, "[b]ecause the focus [of the qualified immunity inquiry] is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability[.]"

11

*Brosseau*, 543 U.S. at 198.

Here, even if Officers Grivas and Hager crossed over the "hazy border between excessive and acceptable force," *Saucier*, 533 U.S. at 206, the Court would be constrained to find that they did not run afoul of clearly established law. *See Evans v. City of L.A.*, 446 Fed. Appx. 4, 6 (9th Cir. 2011) (reversing the district court's denial of qualified immunity where parents of a suspect who was shot and killed by police brought action against officer, alleging that officer used excessive force in shooting suspect and acted with deliberate indifference by not seeking medical care for suspect in timely fashion). While the test for reasonableness under the Fourth Amendment "is not capable of precise definition or mechanical application," *Brosseau*, 543 U.S. at 199 (quoting *Graham*, 490 U.S. at 396), it is well established that the use of deadly force is not constitutionally unreasonable "if the suspect threatens the officer with a weapon" or "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991) (citing *Garner*, 471 U.S. at 11-12); *see also Smith*, 394 F.3d at 704 finding that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force"); *see also Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1119 (9th Cir. 2005) (finding that deputies' use of deadly force against suspect who "was armed with a dangerous weapon, was told to stop and drop it, was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' commands by raising the sword and grunting, refused to let go of the sword, and was intent upon trying to get inside a private residence or its backyard with the sword in hand" was not objectively unreasonable or unconstitutional); *but see Kiles v. City of No. Las Vegas*, 276 Fed. Appx. 620, 622 (9th Cir. 2008) (finding that it would be apparent to a reasonable officer that it was unlawful to use deadly force against "an unarmed individual who had stopped advancing towards him and did not make any threatening movements").

The parties do not dispute the underlying facts that led up to Officers Grivas and Hager's use of deadly force. Prior to their arrival, the officers knew that there had been a domestic

disturbance between Chavez and Olivas, that Olivas was in a volatile emotional state, that Olivas had been making threats and was also armed with a knife, that Olivas had threatened to kill the officers if they arrived at the scene, and that Olivas had expressed a desire to commit suicide by cop. Upon their arrival on scene, Olivas began to approach the officers waving the knife in a threatening manner. Thereafter, Officer Houchen deployed less-lethal force in an attempt to dissuade Olivas' advance. At no point did Olivas respond to the officers' commands, stop his advance toward the officers, drop his weapon, or indicate a willingness to relinquish it. When it appeared to the officers that the less-lethal force had been ineffectual, and Olivas posed a significant threat of death or serious physical injury, Officers Grivas and Hager made the decision to deploy lethal force. Whether that decision was reasonable under the circumstances is not presently at issue. Rather, as previously explained, the relevant inquiry is whether that decision ran afoul of clearly established law. In consideration of the aforementioned authority, the Court concludes that it did not.

     Central to the Court's determination is the fact that the officers were forced to make a split-second decision whether Olivas would inflict serious harm if they did not deploy deadly force. They were responding to a rapidly escalating and volatile situation. The entire encounter lasted less than two minutes. Under the pressure of these circumstances, the Court finds that the officers' actions are clearly the type that the doctrine of qualified immunity is intended to protect. More specifically, the Court finds that a reasonable officer would not have known that his or her actions constituted excessive force under the circumstances.

     Chavez argues that at the time Officers Grivas and Hager used deadly force, Olivas was not close enough to harm them. In this regard, the parties do not dispute the distance from the officers at which Olivas was fatally shot—approximately 27 feet, 37 feet, and 36 feet, respectively. Additionally, the parties do not dispute that the officers received specific training related to individuals with edged weapons, such as knives, which counsels that once an individual gets within 21 feet, the individual poses a risk of death or serious physical injury. Nevertheless, as previously

articulated, the reasonableness of the officers' decision to use deadly force at that particular distance is not the relevant inquiry.  Rather, the relevant inquiry is whether the contours of the law with respect to the use of deadly force are sufficiently clear such that a reasonable officer under the circumstances would understand that his conduct violates that law.  *See Reichle v. Howards*, 132 S.Ct. 1088, 2093-94 (2012) (articulating that to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate") (quoting *al-Kidd*, 131 S.Ct. at 2083).  Here, clearly established law does not dictate that the officers were required to wait until Olivas was capable of actually inflicting death or serious harm to justify the use of deadly force.  Nor does clearly established law dictate a specific distance within which a suspect must come before an officer may reasonably deploy lethal force.  Accordingly, the Court declines to adopt the LVMPD's 21-foot guidance as a basis on which to deny qualified immunity.

Chavez also suggests that, at the time Officers Grivas and Hager used deadly force, there was a less-intrusive alternative to prevent Olivas from reaching a dangerous point of physical confrontation with the officers.[11]  Nevertheless, clearly established law in this regard provides that "[a] reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable."  *Wilkinson*, 610 F.3d at 551 (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  Thus, even assuming there was an available less-intrusive alternative, the officers' conduct would not have been clearly unreasonable and thus unconstitutional.

Next Chavez avers that Officers Grivas and Hager failed to issue a warning before using deadly force, thereby rendering their decision to do so unconstitutional.  Indeed, it is well established that a police officer must, *if practicable*, issue a warning before using deadly force does

---

[11] Chavez cites Police Policy and Procedure Expert Ernest Burwell for the proposition that Olivas' death could have been prevented if "the officers would have used the training, resources, communication, and coordination which they have been taught." Doc. #76, p. 19 (citing Doc. #76, Ex. 5, p. 4); *see also* Doc. #76, Ex. 5, p. 4 (suggesting that a Taser might have been employed as "an excellent less lethal option on aggressive suspects").

14

not render the defense of qualified immunity unavailable.  *See Garner*, 471 U.S. at 11-12 (emphasis added).  Whether Officer Grivas' statement that he was "going lethal" was intended to be a warning and whether it was even practicable to issue a warning before using deadly force are disputed issues of material fact.  Nevertheless, these disputed issues are only relevant to the issue of reasonableness.  Even if a fact-finder were to conclude that Officer Grivas did not issue a warning before using deadly force, his failure to do so does not violate clearly established law, which requires only that a warning be issued *if practicable*.  Moreover, while it is unclear whether Olivas heard the officers' commands as he was approaching,[12] this factor does not change the Court's calculus as to whether Officers Grivas and Hager ran afoul of clearly established law.

Finally, even if Chavez is correct that "[O]fficer Houchen did not conduct his duties as a [CIT] officer in accordance with the written policies and procedures of [the LVMPD] as to planning, tactics, and command, prior to arrival or during the incident[,]" Officer Houchen is not a Defendant in this action and therefore the Court declines to attribute any of his alleged shortcomings to Officers Grivas or Hager.  Chavez also avers that Officers Grivas and Hager did not defer to Officer Houchen, who was trained to intervene and take command in those types of situations.  However, Chavez cites to no authority for the proposition that officers in Grivas and Hager's position are required to defer to those officers who have been specially trained to respond to emotionally volatile situations.

In summary, the law is not "clearly established" such that any reasonable officer would have understood that using deadly force under these circumstances constituted excessive force.  Accordingly, the Court finds that Officers Grivas and Hager are entitled to the defense of qualified immunity on Chavez's first cause of action.  *See Mattos*, 661 F.3d at 448 (holding that defendant officers were entitled to qualified immunity where, in light of existing precedents, court could not

---

[12] There is reason to believe that he did in fact hear the officers' commands as Officer Hager testified that Olivas yelled "I'm not going to drop the knife," presumably in response to the officers' commands to "drop the knife."  *See* Doc. #72, Ex. Q, 61:20-23.

15

conclude that "*every* reasonable official would have understood *beyond debate* that [their actions] in these circumstances constituted excessive force") (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011)) (internal quotation marks omitted); *see also Mason v. Horan*, 73 Fed. Appx. 967, 968 (9th Cir. 2003) (holding that "[e]ven when a reasonable juror could find 'on a favorable view of the parties' submissions that a police officer used excessive force, the officer is entitled to qualified immunity unless there was a 'clearly established rule prohibiting [him] from acting as he did'") (quoting *Saucier*, 533 U.S. at 202). Summary judgment in favor of Defendants on Chavez's first cause of action is therefore appropriate.

### B. Deprivation of Familial Rights

The Ninth Circuit has confirmed that "parents have a Fourteenth Amendment liberty interest in the companionship and society of their children." *Wilkinson*, 610 F.3d at 554. However, such a claim is only cognizable where the official conduct that severs this relationship "shocks the conscience." *Id.* "In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.'" *Id.* (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscious." *Id.* (citing *Porter*, 546 F.3d at 1137). On the other hand, where actual deliberation is not practical under the circumstances, the officer must act with a "*purpose to harm* . . . for reasons unrelated to legitimate law enforcement objectives." *Porter*, 546 F.3d at 1137 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998)); *see also Wilkinson*, 610 F.3d at 554 (" . . . where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives").

///

///

///

Due to the rapidly escalating nature of the confrontation between Olivas and the officers, the Court applies the purpose-to-harm standard.[13]  Applying this standard, there can be no dispute as to whether the use of deadly force by Officers Grivas and Hager was *unrelated* to legitimate law enforcement objectives.  There is simply no evidence in the record upon which any reasonable fact finder could conclude that Officers Grivas and Hager used deadly force for reasons completely independent of the legitimate use of force necessary to protect the public and themselves.  *See A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013) (explaining that illegitimate law enforcement objectives include "bullying a suspect or getting even") (quoting *Wilkinson*, 610 F.3d at 544) (internal quotation marks omitted).  Nor does Chavez contend that Officer Grivas and Officer Hager intended to harm Olivas for purposes completely unrelated to law enforcement purposes.  Finally, there is no evidence in the record to suggest that Officers Grivas and Hager's decision to use deadly force was tainted by an improper or malicious motive.  Even if Officers Grivas and Hager's behavior did not conform precisely to the LVMPD's CIT Policy Manual for situations involving emotionally volatile individuals, it does not shock the conscience.  *See Lewis*, 523 U.S. at 855 (finding no constitutional violation where officer's behavior may have offended "the balance struck in law enforcement's own codes of sound practice").  Accordingly, the Court shall grant Defendants Motion for Summary Judgment as to Chavez's Second Cause of Action.

As to Chavez's assertion that a jury could find "that handcuffing [Olivas] while [the officers] heard gurgling and wheezing and seeing excessive bleeding occurring from [Olivas'] body, and knowing that handcuffing [Olivas] hands behind his back would make it more difficult for [Olivas] to breath, and then not even attempting to administer first aid, evidenced an intent or purpose to harm [Olivas]," the Court finds that it is entirely unsubstantiated by any explanation or evidence in the record.  *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010) ("'[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise

---

[13] Chavez does not dispute the applicability of the purpose-to-harm standard.  *See* Doc. #76, p. 21.

17

genuine issues of fact and defeat summary judgment") (quoting *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)).  Accordingly, the Court declines to entertain this as a basis on which to find that the officers deprived Chavez of her right to familial relations.

### C.   Municipal Liability Pursuant to 42 U.S.C. § 1983

In order to establish municipal liability under section 1983, a plaintiff must show: (1) an employee violated the plaintiff's constitutional rights pursuant to an official policy or informal practice of the municipal entity; (2) that the violator had final policy-making authority, and thus the challenged action itself constituted an act of official governmental policy; or (3) a person with final policy-making authority ratified the unconstitutional behavior.  *Gilette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).  The United States Supreme Court has expressly held that a municipality is not liable merely because it employs a tortfeasor.  *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 691 (1978).

Chavez contends that it is the policy, practice, and custom of LVMPD to tolerate and ratify the use of excessive, unreasonable, and deadly force by its officers.  Doc. #1, ¶32.  Chavez further alleges that it is the policy, practice, and custom of LVMPD to negligently hire, train, and supervise its officers, agents, and employees.  Doc. #1, ¶33.  However, Chavez failed entirely to substantiate her allegations with any supporting evidence.[14]  Chavez has not produced any evidence to establish that the use of excessive force was a formal policy of the LVMPD.  In fact, she appears to concede that the "use of force" policy in effect at the time of Olivas' shooting "arguably passes

---

[14] Chavez references the "revamped" July 2012 use of force policy apparently to demonstrate that the Sheriff was on notice that the written policy that was in effect regarding use of force at the time [Olivas] was shot[] was not being implemented properly by [LVMPD] officers."  Doc. #76, p. 25.  However, Chavez's theory as to why the use of force policy was updated is entirely speculative, certainly in light of the fact that she failed to provide any evidence in support thereof.  Moreover, as Defendants aver, even if the Court were to accept Chavez's unsupported representation that the LVMPD changed its use of force policy in order to cure improper implementation of the prior policy, any evidence with which Chavez would theoretically support her position would be inadmissible pursuant to Federal Rule of Evidence 407, which provides that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; [or] culpable conduct . . . ."

constitutional scrutiny." Doc. #76, p. 25. Moreover, Chavez has not shown the existence of prior constitutional violations by the LVMPD, let alone a practice or custom of tolerating or ratifying the use of excessive, unreasonable, and deadly force by its officers.[15] As to Chavez's negligent hiring, training, and supervision allegations, the record is similarly deficient. Chavez had ample opportunity to engage in discovery and unearth factual support for her claims, but she failed to do so. Accordingly, the Court finds that there is insufficient evidence on which a reasonable jury could base a finding of municipal liability. Summary judgment in favor of the LVMPD on Chavez's third cause of action is therefore appropriate.

### D.     State Law Claims

Because Chavez has failed to carry her burden with respect to her federal claims, the Court declines to exercise supplemental jurisdiction over her state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law"). Accordingly, Chavez's fourth, fifth, and sixth causes of action shall be dismissed without prejudice.

IT IS THEREFORE ORDERED that Defendant LVMPD's Motion for Summary Judgment (Doc. #72) is GRANTED.

IT IS FURTHER ORDERED that Defendants Grivas and Hager's Motion for Summary Judgment (Doc. #73) is GRANTED.

---

[15] Defendants reference a series of newspaper articles discussing LVMPD officer shootings that Chavez produced during discovery. Doc. #72, p. 31. However, because Chavez does not offer any of these newspaper articles into evidence, the Court need not speculate as to their admissibility. Moreover, as Defendants point out, Chavez's police practices expert offered no opinion whatsoever as to whether the LVMPD had a practice or custom of tolerating or ratifying the use of excessive, unreasonable, and deadly force. *See* Doc. #72, Ex. NN. Rather, his expert opinion was limited to issues concerning the specific decision making that took place during the incident in question. *See id.*

19

IT IS FURTHER ORDERED that Defendant LVMPD's Motion for Leave to File Excess Pages (Doc. #71) is GRANTED.

IT IS FURTHER ORDERED that Chavez's fourth, fifth, and sixth causes of action are DISMISSED without prejudice.

IT IS FURTHER ORDERED that the clerk of the court shall enter judgment accordingly.

IT IS SO ORDERED.

DATED this 3rd day of February, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE